Musselman v. Bradley.

---

E. A. MUSSELMAN, APPELLEE, v. LILLIAN J. BRADLEY ET AL., APPELLANTS.

Mortgage Foreclosure: DEFENSE: CONSIDERATION. In an action to forclose a mortgage given to secure two promissory notes, each for the sum of $250, with interest, it appeared as a defense that the notes were given for an alleged stock of goods having but little or no intrinsic value and salable only as auction goods, the real value of which did not exceed one hundred dollars. *Held,* That the decree will be reduced to one hundred dollars, with interest from the date of sale.

APPEAL from the district court of Harlan county. Heard below before GASLIN, J.

*Oyler & Beall* and *James McNeny,* for appellants.

*John Dawson,* for appellee.

MAXWELL, CH., J.

This is an action to foreclose a mortgage given to secure two promissory notes, each for the sum of $250. The

notes and mortgage are signed by both husband and wife.
The defendants file separate answers.   That of the husband
is as follows:

"That on or about the ...... day of ........., 1885, this
defendant and the plaintiff Musselman entered into a con-
tract, by the terms of which said Musselman agreed to and
did sell and transfer to this defendant certain goods, wares,
and merchandise then belonging to said Musselman, upon
the terms and conditions following, to-wit:   The defend-
ant should purchase the said goods at a price which was
then agreed upon, and should thereafter proceed to sell the
same for the best prices which he could obtain therefor,
and out of the proceeds of the sales made by this defendant
he was to pay the said plaintiff for the said goods, but the
said defendant was to be in no manner liable for the pur-
chase price of said goods, except to such extent as he might
realize out of the sale thereof.   At the time of the making
of said contract, and as one of the conditions thereof, the
said Musselman represented and warranted the said goods
to be the same in quality, quantity, and bulk as those
described in a certain invoice or inventory there delivered
by said Musselman to this defendant.   And defendant
says that at the time the said plaintiff made the said rep-
resentations and warranty he knew the same to be false and
fraudulent, and knew that the said goods were not in
quality and quantity the same or similar to the goods de-
scribed in said inventory or invoice, but were greatly infe-
rior in value, were wholly worthless and unsalable, and of
no use or value whatever.   That said defendant, relying
upon the said false and fraudulent representations of
plaintiff, took and accepted said goods under the said con-
tract, but that, upon finding that said goods were utterly
unsalable and worthless, he offered to return the same to
the said plaintiff, but the said plaintiff refused to take back
or receive the same.   That the note and mortgage in con-
troversy, though given nominally to secure the sum of

$500, were in reality given to secure faithful performance of the contract aforesaid on the part of this defendant. And this defendant says he has on his part faithfully performed the said contract, and if any default has accrued therein it has accrued by reason of the false and fraudulent representations and other wrongs of the plaintiff; and the defendant further says that at the time of the contract aforesaid he was drunk and intoxicated, and utterly unfit and incompetent to transact any business whatever. That the said plaintiff knew of the defendant's drunken and intoxicated condition, and so knowing, and intending to cheat and defraud this defendant, caused and procured him in his said drunken and intoxicated condition to enter into the contract and to execute the notes and mortgage aforesaid. That the said notes and mortgage were executed for no other consideration and with no other end or purpose in view than as aforesaid."

The answer of the wife is substantially the same as that of the husband.

The reply is a general denial.

On the trial of the cause the court found in favor of the plaintiff, and rendered a decree for the full amount claimed.

There is a large amount of testimony in the record, from which it appears that the plaintiff sold to the defendants an alleged stock of goods, inventoried at about $2,800. The undisputed testimony also is, that the intrinsic value of the goods was but little or nothing. They evidently were remnants, picked up here and there. The woolen garments were out of fashion and moth-eaten, and almost every article, the testimony shows, was damaged and unsalable. The testimony also shows that these goods were in boxes in the cellar when the defendants purchased them. The plaintiff does not claim that the goods were merchantable, but says that the defendant examined them before purchasing. The defendant states that he merely examined a few articles in one box, there being thirteen or fifteen

boxes in all. The plaintiff's testimony upon many points is evasive and very unsatisfactory. He testifies as follows:

Q. What condition were the goods in?

A. What I regarded fair condition for auction goods.

Q. What kind of parasols were they, paper or cloth?

A. I never examined them particularly.

Q. Did you not take them all out?

A. Yes, sir.

Q. You did not examine them?

A. No, sir, he did. I helped take them out. I suppose they were Japanese parasols, and I could not say. as to their quality.

Q. They were paper?

A. I don't know.

Q. Are not the Japanese parasols always made of paper?

A. They might be.

Q. Did you ever see any Japanese parasols that were not paper?

A. I don't know that I have.

Q. Don't you know that these parasols were paper?

A. I don't know that they were.

Q. Then you don't know whether you sold him the goods in that inventory?

A. Well, he compared them himself.

Q. All you can judge from is the inventory?

A. Yes, sir.

Q. What was the condition of the coats?

A. They were mostly in good, fair condition I think.

Q. Were there holes in them?

A. I think not.

Q. What was the condition of the nubias?

A. Fair condition.

Q. Were they in the same condition as those you had up in the store?

A. Yes, sir.

Q. Why not have them up there?

A. Well, there were more than we could use.

Q. You are used to handling goods?

A. Yes, sir.

Q. You put them down in that cellar when?

A. I think in September.

Q. In what kind of a box were the nubias put?

A. I don't remember.

Q. Do you say that you packed such goods as you sell in your store in September, in the cellar?

A. I mean to say I did.

Q. Did you examine these nubias carefully that day?

A. We took them all out and put back in again.

Q. It took you all day to do that?

A. Yes, sir.

Q. How many boxes were there?

A. Thirteen or fifteen.

Q. You and Bradley were working all the time?

A. Yes, sir.

Q. Where did you get these goods from?

A. I bought them.

Q. Who of?

A. Some in New York, some in Chicago, and some everywhere.

Q. How long had you had them?

A. Well, I can't say.

Q. Did you buy any in this town?

A. Perhaps, some of them.

Q. Who did you buy of here?

A. Well, the stock I bought was from John Compton.

Q. How much of these goods was from the Compton stock?

A. I can't say.

Q. How long had you had that Compton stock?

A. Well, I have been selling it ever since.

Q. Some of this stock was from the Compton stock?

A.   It might have been.

Q.   You bought the Compton stock right out, in a lump?

A.   Yes, sir.

Q.   You did not keep track of the goods?

A.   Yes, sir, we generally know about what we have.

Q.   And generally know where you get them?

A.   We could tell by looking up the bills.

Q.   Was it an old stock?

A.   I could not tell you.

Q.   You examined the stock?

A.   Yes, sir.

Q.   Could you tell?

A.   Well, not exactly.

Q.   When you went down in the cellar could you tell it was an old stock there?

A.   Yes, sir.

Q.   You were selling these suits from eight to twelve dollars a suit?

A.   Well from six to twelve dollars I think I said.

Q.   Were these men's suits that you sold?

A.   Well, some of them.

Q.   Were you selling these musty suits from six to eight dollars apiece?

A.   They were not musty when I put them down there.

Q.   You don't mean that these musty suits down there were worth eight to twelve dollars apiece?

A.   Yes, sir, if you could get it.

Q.   When you put these goods down cellar, did you take these nubias right off from your shelves?

A.   Yes, sir, I think so.

Q.   What kind of goods are they?

A.   They are woolen goods.

Q.   You took them from your shelves in September and put them down cellar?

A.   Yes, sir, to make room for our fall goods.

Q.    Did you pack them carefully down there?

A.    We usually put tobacco in the goods when we pack them.

Q.    ·Was there a tobacco smell down there when you opened them?

A.    I think there was.

Q.    You know that you put tobacco in them when you packed them?

A.    No, sir, I don't know it.    I did not pack all of them.    I thought there was a tobacco smell there.

Q.    You don't remember now that there was a tobacco smell there?

A.    Not positively.

Q.    What condition were those ladies' hose in?

A.    They were in fair condition.

Q.    Were all the goods in fair condition?

A.    In reasonably good condition as auction goods. They were in a fair salable condition.

Q.    All of them?

A.    Most all of them.

Q.    If they were in a fair salable condition this price affixed to them here in this inventory was a fair price?

A.    I did not make any price on them.

Q.    I ask you if this price here in this inventory is a fair price for goods of that quality?

A.    We put them at what we thought they were worth in that inventory.

Q.    Has anything since occurred to change your mind as to their value?

A..    Well, they have been down in the cellar and got a little musty.

Q..    That is the only thing, is it?

A.    Well, I don't understand your question.

Q.    When you made this inventory was when the goods were put in the cellar?

A.    I think so.

The other testimony given by him is of the same nature. All the witnesses called on behalf of the plaintiff were connected with him, either by blood or marriage, and by their testimony it is apparent that the goods were of very little intrinsic value. They are spoken of as "auction goods," by which we are left to infer they could be sold in no other way. The defendants testify that they had been unable to sell them at auction, or in any other mode, and that they were rotten and almost worthless. In this they are corroborated by several other witnesses. The testimony also shows that the defendants, soon after the goods were received, offered to return the same to the plaintiff, and he refused to receive them. It is shown that goods to the value of $40 have been sold, and that the real value of the whole would not exceed one hundred dollars. The claim of the plaintiff that the defendant examined the goods before taking them out of the cellar is not sustained by a preponderance of the testimony, and it is evident that such examination was not made until after the execution of the notes and mortgage in question. The mortgaged property in this case is the homestead of the defendants, and the testimony tends to show that it was purchased and paid for by the wife. The decree of the district court for the full amount of the face of the notes, with interest, and directing a decree of foreclosure upon the property in question therefor, is reversed, and a decree will be entered for the sum of one hundred dollars, with interest thereon, the value of the goods at the time of the purchase.

DECREE ACCORDINGLY.

THE other judges concur.